## 17270

R. H. RICKER, Respondent, v. VILLAGE MANAGEMENT CORPORATION and Liberty Mutual Insurance Company, Appellants

(97 S. E. (2d) 83)

*Messrs. Henderson, Salley & Cushman,* of Aiken, *for Appellants,*

*Messrs. Williams & Busbee,* of Aiken, *for Respondent,*

March 12, 1957.

TAYLOR, Justice.

This is a Workmen's Compensation case in which the employer and its insurance carrier appeal from an Order of the Circuit Court affirming the findings of The South Carolina Industrial Commission that respondent is totally disabled by reason of having suffered an accident which arose out of and in the course of his employment by Village Management Corporation, on June 6, 1951; and as a result of respondent's accident and injury aggravated by a previous injury or disease which was dormant that respondent was then and has been since his injury totally and permanently disabled. The Circuit Judge while affirming the award remanded the case to The Industrial Commission to determine and give appellants credit for such amounts as had been paid respondent subsequent to his injury.

Appellants contend that the Circuit Judge erred in ruling: first, that the evidence and testimony were sufficient to sustain a finding that the claimant's condition resulted from an accident arising out of and in the course of his employment; second, that the evidence and testimony were sufficient to sustain a finding that the alleged accident resulted in a disabling injury or an injury aggravating a pre-existing condition or disease; third, that the evidence and testi-

mony warranted a finding that the employer had timely notice, information, and knowledge of respondent's accident and injury and that appellants were not prejudiced by respondent's failure to notify his employer that he had or claimed to have had an accident, in writing, within thirty days thereof or a reasonable time thereafter.

Respondent, R. H. Ricker, a man fifty-six years of age, had been employed by the Village Management Corporation many years as a policeman and bus driver; but his duties on June 6, 1951, consisted solely of driving a forty-two passenger motor bus, picking up textile employees about the villages of Langley, Bath, Clear Water, Belvedere, and the Town of North Augusta in Aiken County, South Carolina, and across the State line into Augusta, Georgia, delivering them to their respective work shifts and at the same time picking up other employees who had completed their work shifts and returning them to their homes. Although plaintiff was not required to work continuously, he worked six days each week beginning at 6 a. m. and continuing until nearly midnight with rest periods between schedules and such employment was continuous until June 6, 1951, when respondent suffered a heart attack.

In June, 1951, construction on the Savannah River Hydrogen Bomb Plant in South Carolina was in full progress and many thousands of workers from the City of Augusta and surrounding areas were then employed in the construction of that plant, traveling to and from their work along the same route as that used by respondent. The bus, being a forty-two passenger motor bus, was awkward and cumbersome; and the route led into the City of Augusta, Georgia, on 14th Street, Southward to Green Street, where he made a left turn and proceeded Eastward on Green Street. The afternoon shift at the Savannah River Plant changed at 5 p. m., and at 5:30 p. m., the vehicular traffic was particularly congested. June 6, 1951, was a hot day. Respondent, a heavy man, had commenced his scheduled route at 5 p. m., with a load of mill employees, facing a hot sun. Re-

spondent, in order to make the left turn successfully with the long bus, had not been using the left hand traffic lane immediately prior to making the turn. A short while before respondent was involved in a traffic accident, at this intersection, with a car which had attempted to pass on the left side while he was attempting to make such turn. Because of the unduly heavy traffic, he considered it safer thereafter to approach the intersection in the left traffic lane which required him to make a shorter turn than he had been making and involved considerable strain. While making this turn on June 6, he felt a "hot, burning, drawing" intense pain such as he had never experienced before but thinking it was only gas pains, continued to drive the bus along the route and back home. Again, on the succeeding two days, June 7 and 8, he made his usual rounds and started again on June 9, the third day after feeling the sharp pain in his chest, when the pain returned with such intensity that it became necessary to stop his bus and have medical attention. He was immediately hospitalized until August 16, 1951.

Dr. C. M. Templeton, respondent's physician, who practices medicine in both Georgia and South Carolina, testified that he had known respondent all of his life and had never treated him for any ailment before June 9, 1951, with the exception of a stomach disturbance in 1946 which had nothing to do with his present trouble; that when called to attend respondent on June 9, he found that he was suffering excruciating pain, was cyanotic, and that he gave him a hypodermic injection and from the house where he had been placed when taken from the bus, he removed him to a hospital where he administered oxygen and medications; his diagnosis was a coronary infarction, proven by electrocardiogram, congestive heart failure, proven clinically. He further stated that in his professional opinion, respondent has been totally and permanently disabled since June 9, 1951. He further testified that a large percentage of such heart cases is associated with exertion, strain, or lifting; that there comes the onset and then the final blow: "This tissue be-

comes soft and is ready to blow out just like a soft spot in a tire may be bruised and just blow out. I would say, in all probability (so far as we can determine medically, unless it had become a post mortem examination which would have been the only way to prove it definitely) ; but in my opinion —that was the onset of the trouble, and he began to have a recurrence of pain right on until this final episode. And I think probably his exertion to turn the bus, in oncoming traffic, certainly the tension and strain was enough to produce those things if set up was right."

Dr. Harry T. Harper, Jr., a heart specialist, of Augusta, Georgia, testified that he examined plaintiff on October 27, 1952, approximately sixteen months after the accident; that he was of the opinion that the respondent had coronary sclerosis for some time prior to his attack; that most attacks of coronary occlusion occur at rest, in bed, and without any precipitating factor in the way of physical exertion, making it exceedingly unlikely that the effort of making a sharp turn with the steering wheel had anything to do with bringing on an attack of coronary occlusion; and this witness was further of the opinion that respondent was not totally and permanently disabled, but was able to carry on some gainful occupation. Upon cross examination, however, Dr. Harper expressed the opinion that it was possible that there was a direct or casual connection between the exertion exercised by respondent on June 6, 1951, and the pain which immediately followed in his chest; that he thought there could be a connection between the two. Dr. Harper testified further that the evidence showed respondent in the past definitely had a thrombosis, but that he (the witness) could not tell what time respondent had it and could not say that the thrombosis did not occur when respondent said it did and that he (the Doctor) had no reason to doubt that it occurred at that time. He further stated that in his opinion the pain which respondent had on June 6 was not that of thrombosis because the pain lasted only about twenty-five minutes, then disappeared, and then respondent had further pain on June

9, because the usual rule is that one with coronary thrombosis has protracted pain, which lasts for hours, but that there are exceptions and this could be an exception.

The witness, Dr. C. M. Templeton, was examined in reply to the testimony of Dr. Harper, and he further testified that in his opinion, respondent's condition was the result of a disease, aggravated by the strain to which he had testified before. He stated further that his examination of respondent showed the presence of arteriosclerosis, which had existed for several years, classified between mild and moderate; that any stress no matter of what origin, aggravated the underlying process to produce the actual accident which might be nervousness, might be emotional, might be overeating and might be physical exertion, the most common being physical exertion; that while most attacks happen during sleep, a history properly taken will show it to be preceded by some stress; that most people who have these things at sleep have some previous strain in the hours preceding. A portion of Dr. Templeton's testimony was as follows:

"I think what happened in the seventy-two hour interval he probably had his beginning episode on the 6th, and I think it was a continuing process over until the final episode on the 9th. Now, those things happen. We see people that have what they call indigestion and they are over it, and in two or three days they are dead. They have a little pain, not enough to bring it into action, and two or three days later the plug in the heart gives away and that is it. It could be a spasm of one of the vessels that gave the original episode, and then a final closing at a later date. I don't think you can hold to a strict and fast rule on those things. There are exceptions to all things, and I think once the process begins it is inevitable that it finish."

Appellants also contend that they were prejudiced by not having been given timely notice and actual knowledge; that almost a year had lapsed before respondent filed his claim and requested a hearing before The

Industrial Commission. It is undisputed that formal notice was not given within the statutory thirty days; however, the employer certainly had adequate notice as it became necessary for them to send another employee to bring the bus back to their place of business from where it had been left when respondent was removed therefrom to the hospital on June 9; and Mr. P. Broadus Motes, the manager, went to the University Hospital shortly thereafter for the purpose of seeing respondent, and, later, went a number of times to the Veterans Hospital where respondent had been moved, and talked with him about his condition after he left the hospital. Immediately after respondent's attack on June 9, there was a period of some "thirty or forty days" before respondent was able to talk with Mr. Motes; however, Mr. Motes was aware of the circumstances and could easily have made such investigations as he deemed necessary. It is apparent that respondent was not able to give notice within the statutory period because of the nature of his disability, but that the employer had ample notice and knowledge of the facts and surrounding circumstances within a reasonable time.

The latest appeal to come to this Court in a heart case was *Price v. B. F. Shaw Co.*, 224 S. C. 89, 77 S. E. (2d) 491, 495, wherein the deceased had been suffering from heart trouble and having attacks therefrom off and on for at least two years. On the date of death, he suffered another attack at approximately 4 a. m., but later arose and, although ill, left home at approximately 7 a. m. for his work twenty miles distant. Upon arriving, he first attended a safety meeting, then proceeded to his work carrying wrenches, weighing from ten to twenty pounds each, he being a "plumber" or "pipe fitter" and in lifting a skid weighing "twelve to twenty-two" pounds for the purpose of using it to move a pipe into proper position suffered an attack and died almost instantly at approximately 8:50 a. m. The widow was denied benefits by this Court in a divided Opinion, the majority stating:

"* * * we are asked to hold that compensation may be had where an employee dies in the regular performance of his duties from a heart attack, although not at the time nor prior thereto doing any work requiring unusual exertion. Here, the employee suffered a heart attack early in the morning of the day on which he died while lying in bed at his home, which attack was evidently a most serious one. Despite this serious attack, and knowing he had "heart trouble', and feeling so bad that he was unable to eat any breakfast, drinking only a cup of coffee, and having to be assisted in putting on his work clothes, he left his home to ride twenty miles to the place of his employment, and there entered upon the performance of his work, dying shortly thereafter and while engaged in the work.

"The medical testimony is definitely to the effect that the deceased should have remained in bed on that morning and any physical exertion at all was hazardous and might have precipitated the attack. While the medical testimony warrants the inference that if the deceased had stayed in bed, he might have lived longer, yet he chose not to stay in bed, and it is therefore wholly conjectural whether the heart attack which resulted in his death was precipitated or accelerated by the work, or the exertion incident to getting out of bed, dressing and going to work. All of the doctors testifying in the case were in accord that where a person has a serious heart attack, he should remain in bed.

"There is not a scintilla of evidence, as this phrase is construed to mean, * * *, that the deceased was subjected to any unusual exertion or strain; * * *."

Under the unusual exertion or strain rule to which this Court has consistently adhered, there is evidence to sustain the finding of the Industrial Commission. See, also, *Green v. City of Bennettsville,* 197 S. C. 313, 15 S. E. (2d) 334; *Willis v. Aiken County,* 203 S. C. 96, 26 S. E. (2d) 313; *Sweatt v. Marlboro Cotton Mills,* 206 S. C. 476, 34 S. E. (2d) 762; *Westbury v. Heslep & Thomason Co.,* 199 S. C. 124, 18 S. E. (2d) 668; *Raley v. City*

*of Camden,* 222 S. C. 303, 72 S. E. (2d) 572; *Rivers v. V. P. Loftis Co.,* 214 S. C. 162, 51 S. E. (2d) 510; *Windham v. City of Florence,* 221 S. C. 350, 70 S. E. (2d) 553; *Branch v. Pacific Mills,* 205 S. C. 353, 32 S. E. (2d) 1; *Willard v. Commissioners of Public Works of City of Spartanburg,* 219 S. C. 477, 65 S. E. (2d) 874.

Appellant was in nowise prejudiced by failure of respondent to give formal notice within the statutory period, *Raley v. City of Camden, supra;* and Respondent does not appeal from the Order of the Circuit Court remanding the case to The Industrial Commission for the purpose of allowing appellants credit for such sums as were paid respondent subsequent to his injury.

We are of the opinion that all exceptions should be dismissed; and It Is So Ordered.

Affirmed.

STUKES, C. J., and OXNER and MOSS, JJ., and E. H. HENDERSON, Acting Associate Justice, concur.